# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Web Construction Inc., a Minnesota
corporation,

                              Plaintiff,

                                                Civ. No. 06-5061 (RHK/AJB)
                                                **MEMORANDUM OPINION
                                                AND ORDER**

v.

Cincinnati Insurance Company, an
Ohio corporation,

                              Defendant.

Jeffrey A. Ehrich, Steven P. Zabel, Robert L. Smith, Leonard, Street and Deinard, P.A.,
Minneapolis, Minnesota, for Plaintiff.

Scott G. Williams, William L. Moran, Murnane Brandt, P.A., St. Paul, Minnesota, for
Defendant.

## INTRODUCTION

        This case involves an insurance-coverage dispute.  Plaintiff Web Construction Inc.

("Web") filed this declaratory-judgment action against Defendant Cincinnati Insurance

Company ("Cincinnati"), seeking a determination that Cincinnati must pay for damages

allegedly caused by Web's "subcontractor," Owatonna Concrete Products, Inc.

("Owatonna").  Both Web and Cincinnati filed motions for summary judgment.  For the

reasons set forth below, the Court will deny both Motions.

# BACKGROUND

## I.     The Construction Project

Web is a general contractor in Mankato, Minnesota.  (Josh Williams[1] Aff. ¶ 1.)  In February 2004, Web entered into a contract with Itron, Inc. ("Itron") for the construction of an addition to Itron's manufacturing facility in Waseca, Minnesota.  (Id. Ex. A.)  The project required, among other things, that Web install a 5 ½-inch thick, 38,400 square foot concrete slab floor, for which Itron agreed to pay Web approximately $1.6 million.  (Id. ¶ 6; Ex. A at 2.)  In October 2003, Web requested a bid proposal from Owatonna for materials and certain services in connection with the installation of the concrete floor.  (Id. ¶ 6.)  On October 24, 2004, Owatonna provided Web with a bid proposal for the floor.  (Id. Ex. B.)  Web accepted Owatonna's bid on November 18, 2003.  (Id. ¶ 7.)  Web and Owatonna did not enter into a written subcontract agreement for the Itron project.  (Scott Williams Aff. Ex. P at 100.)

### A.     The Concrete Specifications

Itron hired an architect to create a specifications manual for the Itron project, which was issued on October 14, 2003 ("Specifications Manual").  (Josh Williams Aff. ¶ 8.)  Section 2.01A of the Specifications Manual provided a number of requirements for the composition of the concrete, most notably, that no shale was to be included in the fine aggregate of the concrete.  (Id. Ex. C § 2.01A).  Section 1.02 also required Web to submit the proposed concrete-mix design of each class of concrete to a testing laboratory for review prior to starting its work on the Itron facility.  (Id. § 1.02.B.3)  This section also

---

[1] Josh Williams served as the project manager for Web.

required Web to "[t]est [the] cement and aggregate to ensure they [met the] specified

requirements." (Id. § 1.02.B.4)  In addition, the Specifications Manual provided that the

contractor could request "mix design adjustments" when "characteristics of materials,

project conditions, weather, test results, or other circumstances" required such action.

(Id. Ex. C § 2.02C.3).

### B.    Design and Testing of Concrete Mix

Owatonna informed Web that it hired American Engineering and Testing ("AET")

to design the formula for the Itron concrete mix.  (Id. ¶ 10.)  Owatonna provided Web

with AET's design mix for the Itron project in November 2003.  (Id. Ex. D.)  Web,

however, rejected this design mix because it concluded that the compressive strength

rating was too high and that it included too much cement.  (Id. ¶ 10.)  In March 2004,

Owatonna provided Web with a new design mix formula from another engineering firm,

Huntingdon Engineering and Environmental ("Huntingdon").  (Id. ¶ 11.)  This design

mix was ultimately used for the Itron project.  (Id.)

Owatonna then hired Waseca Redi-Mix ("Waseca") to produce the concrete

according to the concrete-mix design.  (Id. Ex. P at 56, 67.)  Waseca loaded it into

specialized ready-mix trucks in order to prevent premature curing and delivered it to the

Itron facility.  (Josh Williams Aff.  ¶ 12.)

### C.    Installation of Concrete Floor at Itron's Facility

Web began the installation of the concrete floor at the Itron facility on April 1,

2004, and completed it on April 8, 2004.  (Scott Williams Aff. Ex. B.)  Web had

approximately ten employees at the Itron site involved in the installation of the concrete

floor.  (Id. Ex. D. at 44.)  Web also hired Owatonna to perform some on-site services in connection with the installation of the concrete.  (Josh Williams Aff. ¶ 13.)  Web was generally responsible for complying with Part 3 of the Specifications Manual ("Execution Section"), which addressed the installation of the concrete.  (Id.)  Section 3.04B required that the concrete be deposited either continuously, or in layers, so long as the bottom layers did not harden first.  (Id.)  Because Owatonna's ready-mix trucks could not deposit the concrete directly to its final resting place, Web asked Owatonna to pump the concrete to the proper location pursuant to Section 3.04B of the Specifications Manual.  (Id. ¶¶ 14, 15, 16.)  In turn, Owatonna retained Concrete Placement, Inc. ("CPI") to perform these services, in which they pumped the concrete through a 4-inch diameter, 400 foot long hose.  (Id. ¶ 17.)  Before discharging the concrete from the ready-mix truck into the pump trucks, Owatonna had to first test the consistency of each batch of concrete to ensure that it could be properly distributed.  (Id.)  Owatonna tested the consistency of the concrete and either added water or a water-reducing agent to make sure it complied with its specification.  (Id.)

After Owatonna poured the concrete into the pump-truck hopper, CPI monitored the pump-truck equipment to ensure even distribution of the concrete to its final resting location.  (Id. ¶ 18.)  Web was responsible for determining where the concrete was to be delivered, setting the forms, laying the mesh, leveling the concrete, troweling the

concrete, and finishing the concrete with a cure and sealer.[2]   (Scott Williams Aff. Ex. D at 45-46, 55-60, 116-17; Ex. P at 98-98.)

### D.   The Concrete Floor Defects

Itron noticed cracks and "popouts" in the surface of the concrete floor a few months after it was installed.  (Josh Williams Aff. ¶ 22.)   In October 2005, Web had substantially completed the construction of the Itron addition.  (Id. ¶ 23.)  Itron took possession of the entire facility shortly thereafter, but the popouts continued to occur. (Id.)  Itron then made demands that Web pay for the damage.  (Id.)

Web's expert witness, Brian Pashina, concluded that the popouts were caused by shale particles that were present in the fine aggregate of the concrete.  (Pashina Aff. Ex. A. at 3.)   Pashina opined that "[t]he Popouts would not have occurred if the fine aggregate used in the concrete had not included shale particles."  (Id.)  Web also retained Rachel Detwiler, a Senior Materials Engineer from Braun Intertech Corporation, to prepare a report regarding the concrete floor at Itron's facility.  Detwiler opined that the "majority of surface defects were determined to be popouts caused by alkali-silica reaction."[3]   (Scott Williams Aff. Ex. J.)

Cincinnati's expert witness, Howard Noziska, concluded that the popouts at the Itron facility were caused by "the expansive aggregates in the concrete and the finishing,

---

[2] Web "spent a substantial amount of time preparing the site and smoothing and curing the concrete."  (Doc. No. 25 at 4 n.2.)

[3] She also opined that "some additional surface defects were apparently caused by impressions of the aggregate particles caused by movement of these particles during finishing."  (Id.)  She explained that "[t]his is why you observed worse effects where a second coat of sealer had been applied: two coats retain more moisture than one."  (Id.)

curing, and sealing activities performed by Web." (Scott Williams Aff. Ex. H.)   Noziska

also opined that Web "failed to have the concrete tested before installation, and then due

to methods employed by [Web] to finish and seal the concrete, various surface problems

occurred."[4]  (Id.)

## II.   Itron's Arbitration Award

On July 17, 2006, Itron filed an arbitration demand against Web, seeking damages

for the defects in the concrete floor.  (Josh Williams Aff. Ex. J.)  In July 2007, an

arbitrator rendered a decision against Web, awarding Itron $588,276.00. [5]  (Scott

Williams Aff. Ex. Q; Smith Aff. Ex. C.)  The arbitrator held that "Itron is entitled to what

it bargained for under its Project construction with Web Construction -- smooth, clean

concrete floor surfaces that did not contain shale." (Smith Aff. Ex. C.)   The arbitrator

explained that the concrete furnished for the project by Web contained shale and the

chemical reaction to shale in the concrete mix caused popouts.  (Id.)  The arbitration

award provided that "[n]othing in the Arbitration Award . . . should be construed as

limiting Web Construction's right to seek recovery from its Project suppliers or

subcontractors regarding the inclusion of shale in the concrete mix."  (Id.)

## III.   The Policy

Web was insured under a Commercial General Liability ("CGL") policy ("the

Policy") issued by Cincinnati.  (Josh Williams Aff. Ex. F.)  The Policy provides liability

---

[4] Owatonna retained Daniel Vruno, a Senior Concrete Engineer for AET.  (Scott Williams Aff. Ex. L.)  He concluded that "[t]he reactive popout condition was aggravated by sealing the surface." (Id.)

[5] This arbitration award to Itron was a net award, which included a credit to Web for its counterclaim of $40,997.00.  (Smith Aff. Ex. C.)

coverage "for those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage' to which this insurance applies."  (Id. at 3.)  The term "property damage" is defined as "[p]hysical injury to tangible property, including all resulting loss of use of that property."  (Id. at 21.)

The insurance applies to "property damage" only if it is caused by an "occurrence."  (Id. at 3.)  "Occurrence" is defined as an "accident, including continuous or repeated exposure to substantially the same general conditions."  (Id. at 20.)

### A.    Relevant Exclusions

Damage to "Your Work"

The "your work" exclusion provides that the insurance does not apply to "[p]roperty damage to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'"  (Id. at 5.)   "Your work" is defined as "(1) [w]ork or operations performed by you or on your behalf; and (2) [m]aterials, parts, or equipment furnished in connection with such operations."  (Id. at 20.)   However, there is an exception to the "your work" exclusion: "[t]his *exclusion does not apply if* the damaged work or the work out of which the damage arises was *performed on your behalf by a subcontractor*."[6]  (Id. at 5. (emphases added).)

Damage to Property

The "Damage to Property" exclusion provides that there is no coverage when there is property damage to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf *are*

---

[6] The Policy does not define "subcontractor."

*performing operations*, if the 'property damage' arises out of those operations[.]"  (Id. (emphasis added).)

<u>Damage to Impaired Property or Property Not Physically Injured</u>

Finally, there is no insurance coverage for "'[p]roperty damage to 'impaired property' . . . arising out of: (1) [a] defect, deficiency, inadequacy, or dangerous condition in 'your work'; or (2) [a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms."  (Id.)  The Policy defines "impaired property" as:

> "[T]angible property, *other than* . . . *'your wor*k', that cannot be used or is less useful because:
>
> (a) It incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous; or
>
> (b) You have failed to fulfill the terms of a contract agreement; if such property can be restored to use by:
>
> > (a) The repair, replacement, adjustment or removal of 'your product' or 'your work'; or
> >
> > (b) Your fulfilling the terms of a contract or agreement.

(Id. at 16 (emphasis added).)

**B.    Web's Attempt to Obtain Coverage under the Policy**

In July 2005, Web notified Cincinnati of a potential claim for the popouts in the concrete floor.  (Josh Williams Aff. ¶ 25.)   In response, Cincinnati conducted its own investigation to determine the cause and whether there was coverage under its Policy. (Ehrich Aff. Ex. D.)

On August 7, 2006, Cincinnati sent Web a denial of coverage and reservation-of-rights letter.  (Josh Williams Aff. Ex. K.)  On September 26, 2006, Web formally sought coverage for the defense of Itron's arbitration demand.  (Smith Aff. Ex. A.)  On October 23, 2006, Cincinnati reaffirmed its position and denied coverage for Web's claim.  (Id. Ex. B.)  On December 6, 2006, Web filed this action against Cincinnati in state court seeking coverage under the Policy; Cincinnati removed the case to this Court and both parties now seek summary judgment.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  The moving party bears the burden of showing that the material facts in the case are undisputed.  Celotex, 477 U.S. at 322; Mems v. City of St. Paul, Dep't of Fire & Safety Servs., 224 F.3d 735, 738 (8th Cir. 2000).  The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.  Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000); Calvit v. Minneapolis Pub. Schs., 122 F.3d 1112, 1116 (8th Cir. 1997).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

## ANALYSIS

### I.      Interpretation of Insurance Policies

State law governs the interpretation of insurance policies.  Nat'l Union Fire Ins.
Co. of Pittsburgh v. Terra Indus., Inc., 346 F.3d 1160, 1164 (8th Cir. 2003).  Under
Minnesota law, the interpretation of an insurance policy is a question of law for the
Court.[7]  Watson v. United Servs. Auto. Ass'n, 566 N.W.2d 683, 688 (Minn. 1997).
When an insurance policy's language is unambiguous, the Court interprets that language
"in accordance with its plain and ordinary meaning."  Ill. Farmers Ins. Co. v. Glass Serv.
Co., 683 N.W.2d 792, 799 (Minn. 2004).  When an insurance policy's language is
ambiguous, however, the Court will generally construe that language against the drafter
and in favor of the insured.  Nathe Bros., Inc. v. Am. Nat'l Fire Ins. Co., 615 N.W.2d 341,
344 (Minn. 2000).  In addition, the insurer bears the burden to establish the applicability
of an exclusion.  SCSC Corp. v. Allied Mut. Ins. Co., 536 N.W.2d 305, 311-14 (Minn.
1995).  If the insurer demonstrates that an exclusion applies, then the insured must show
that an exception to the exclusion applies because the exception "restores" coverage, and
the insured has the ultimate burden of proving coverage.  Id. at 314.

### II.      Accidental Property Damage Constitutes An "Occurrence"

The insuring clause of the Policy provides that Cincinnati's obligation to provide
coverage arises only if there is an "occurrence."  (Josh Williams Aff. Ex. F at 3.)  The
Policy defines "occurrence" as an accident.  (Id. at 18.)  If there is an "occurrence" the

---

[7] Neither party has argued that another state's law governs the Policy.  See BBSerCo, Inc. v.
Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (law of forum state applies by default where
parties do not raise choice-of-law issue).

Policy requires the insurer to provide coverage "for those sums that the insured becomes legally obligated to pay as damages because of . . . 'property damage'. . . ." (<u>Id.</u> at 1.) Accordingly, the Court must first determine whether there was an "occurrence" in this case.  If there was, the Court must then determine whether that occurrence resulted in property damage.  If the Court concludes that there was property damage, then the insurer must provide coverage to the insured unless the losses are excluded by a provision in the insurance policy.

Web argues that the concrete floor defects here constitute an accident under the Policy and that such defects also constitute property damage.  (Pl.'s Mem. at 18-19.)  In response, Cincinnati contends that Web's faulty construction cannot be considered an "occurrence" as a matter of law.  (Def.'s Mem. at 24-29.)  In particular, Cincinnati argues that the "business-risk" doctrine precludes coverage for Web's defective construction. (<u>Id.</u>; Def.'s Opp'n Mem. at 14-22.)  At its core, the business-risk doctrine is based on the premise "that an insured should not be able to look to its general liability policy to protect it against the costs of having to repair or replace its work because it was improperly performed in the first place."  4 Phillip L. Bruner and Patrick J. O'Connor, Jr., <u>Bruner & O'Connor on Construction Law</u> (West 2002).  The Minnesota Supreme Court has explained:

> If insurance proceeds could be used to pay for the repairing and/or replacing of poorly constructed products, a contractor or subcontractor could receive initial payment for its work and then receive subsequent payment from the insurance company to repair and replace it. . . .  Equally repugnant on policy grounds is the notion that the presence of insurance obviates the obligation to perform the job initially in a workmanlike manner.

Knutson Constr. Co. v. St. Paul Fire & Marine Ins. Co., 396 N.W.2d 229, 235 (Minn. 1986); see also Bor-Son Bldg. Corp. v. Employers Commercial Union Ins. Co. of Am., 323 N.W.2d 58, 63 (Minn. 1982) (applying business-risk doctrine and holding that insurer had no duty to defend because damages arose out of contractor's breach of contract).

Cincinnati argues that the Minnesota Supreme Court's decisions in Bor-Son and Knutson defeat insurance coverage for Web's claim.[8]  However, "[u]nder pre-1986 CGL policies, Minnesota's Business Risk Doctrine applied to damage arising out of work performed by subcontractors where the general contractor had exclusive control and responsibility for the work of the subcontractor."  O'Shaughnessy v. Smuckler Corp., 543 N.W.2d 99, 102 (Minn. Ct. App. 1996).  Thus, the insurance policies at issue in Bor-Son and Knutson excluded coverage for property damage arising out of "work performed" by the insured or the insured's subcontractor.  Id. at 102-03.  In 1986, however, the "work performed" exclusion was replaced with the "your work" exclusion.  Id. at 103.  Unlike the "work performed" exclusion, the "your work" exclusion does not exclude coverage for work that subcontractors perform on behalf of the insured.  Id. at 103-04.  Thus, the scope of the business risk doctrine is much narrower with post-1986 CGL policies:

> We cannot conclude that the exception to [the "your work" exclusion] has no meaning or effect. The CGL policy already covers damage to the property of others. The exception to the exclusion, which addresses

---

[8] Cincinnati also asserts that this Court applied the business-risk doctrine to defeat coverage in Aten v. Scottsdale Insurance Co., Civ. No. 06-293, 2006 WL 2990476, at *4 (D. Minn. Oct. 19, 2006).  But, Aten is factually distinguishable from this case and was decided at the motion-to-dismiss stage.  Aten is currently on appeal to the Eighth Circuit Court of Appeals.

"property damage" to "your work" must therefore apply to damages to the insured's own work that arise out of the work of a subcontractor. Thus, we conclude that the exception at issue was intended to narrow the business risk doctrine. . . . Under our holding in the current language of the policy, the business risk doctrine would still apply to work performed by the general contractor and to other deficiencies in a subcontractor's work that do not constitute "property damage." Absent policy language to the contrary, the business risk doctrine would also preclude a subcontractor from making a claim against its own insurer to recover the cost of the repair or replacement of its own defective work. The insurance industry is, of course, free to alter this result in future cases by seeking to change the language of its policies.

O'Shaughnessy, 543 N.W.2d at 102 ("the fact that the general contractor receives coverage will not relieve the subcontractor of ultimate liability for unworkmanlike or defective work.  In such a case, an insurer will have subrogation rights against the subcontractor who performed the defective work"); see also Kalchthaler v. Keller Constr. Co., 591 N.W.2d 169, 174 (Wis. App. Ct. 1999) ("For whatever reason, the industry chose to add the new exception to the business risk exclusion in 1986.  We may not ignore that language when interpreting case law decided before and after the addition.") Indeed, the Minnesota Supreme Court has held that the determination of whether coverage exists under a CGL policy must be based upon the express terms of the policy. Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 880 (Minn. 2002).  Although the business-risk doctrine helps illuminate the underlying purpose of CGL insurance, it does not act as an independent basis to override the express language of the insurance policy. Id.  The Court must still look to the plain language of the Policy to determine whether coverage applies.

Applying these principles, the Court determines that there was an "occurrence" because the concrete floor defects constituted an accident.  An "accident" under a CGL policy is an "unexpected, unforeseen, or undesigned happening or consequence."  <u>Am. Family Ins. Co. v. Walser</u>, 628 N.W.2d 605, 611-12 (Minn. 2001) ("where there is no intent to injure, the incident is an accident, even if the conduct itself was intentional").  There is no evidence that Web or anyone working on its behalf intentionally caused the concrete floor defects.  Furthermore, the record clearly shows that popouts in the concrete floor constitute "property damage" under the Policy because such defects caused "physical injury" to the floor.

Because the Court concludes that there was an occurrence that resulted in property damage, Cincinnati has a duty to provide coverage to Web unless the losses fall within an exclusion in the Policy.

## III.    The "Your Work" Exclusion[9]

Cincinnati argues that the "your work" exclusion precludes coverage for Web.  As set forth above, the Policy precludes coverage for "property damage to 'your work' arising out of it or any part of it . . . ."  (Josh Williams Aff. Ex. F at 5.)  However, "[t]his exclusion *does not apply if* the damaged work or the work out of which the damage arises was *performed on your behalf by a subcontractor*."  (<u>Id.</u> (emphases added).)

Web argues that the exception to the "your work" exclusion restores coverage here.  (Pl.'s Mem. at 12-17.)  In particular, Web argues that Owatonna was a

---

[9] The Court finds that the "Damage to Property" and "Impaired Property" exclusions are inapplicable.

"subcontractor" and therefore the exception applies.  In <u>Wanzek Construction, Inc. v.</u>
<u>Employers Insurance of Wausau</u>, 679 N.W.2d 322 (Minn. 2004), the Minnesota Supreme
Court addressed whether a supplier was a "subcontractor" under the exception making
the exclusion for damage to "your work" inapplicable.  In that case, the general
contractor (Wanzek) was awarded a contract to build a municipal swimming pool.  <u>Id.</u> at
324.  Specifications prepared by an architect required the general contractor to provide
material, labor, equipment, and services needed to deliver and install precise pool-coping
stones to cover the perimeter overflow.  <u>Id.</u>  The specifications detailed the required
density, strength, size, pattern, and color of the coping stones.  <u>Id.</u>  The general contractor
entered into a purchase agreement with Aquatic to manufacture and deliver custom
coping stones for the swimming pool.  <u>Id.</u>  The general contractor also paid Aquatic to
provide on-site supervision to the general contractor's employees for either three days of
installation or until they felt capable of installing the stones without supervision.  <u>Id.</u>

When the pool opened for use, patrons were injured because a large number of the
coping stones cracked.  <u>Id.</u>  The general contractor replaced the defective coping stones
and then submitted a claim under its CGL policy with its insurer.  <u>Id.</u>  The insurance
company denied coverage contending that the insurance did not cover the cost of
remedying defects in workmanship because the exclusion for damage to "your work" in
the CGL insurance policy precluded coverage.  <u>Id.</u>

The general contractor then filed a declaratory-judgment action against its insurer
to determine coverage.  <u>Id.</u>  The district court granted summary judgment in favor of the
insurance company, but the court of appeals reversed, holding that Aquatic was a

subcontractor and therefore the "your work" exclusion did not apply.  The Minnesota

Supreme affirmed the court of appeals and found that the term "subcontractor" in the

CGL policy was ambiguous because it was not defined in the policy and there was no

statutory or regulatory definition.  Id. at 329.  The Minnesota Supreme Court determined

that when "a supplier *custom fabricates the materials to the owner's specifications* and

*provides on-site services* in connection with the installation, the supplier meets the

definition of subcontractor under the exception to the 'your work[]' exclusion."  Id.

(emphases added).

The determination of whether the subcontractor exception to the "your work"

exclusion applies is a question of law for the Court to decide.  However, as explained

below, there are genuine issues of material fact with respect to Owatonna's role in the

Itron project.

## A.      Owatonna's Role in Providing a Concrete Mix to Web

Web claims that Owatonna was responsible for compliance with Section 2.01A of

the Specifications Manual, which contained the composition requirements for the

concrete that was to be used at the Itron facility.  (Williams Aff. ¶ 8.)  In response,

Cincinnati argues that there is no evidence that Web entered into an agreement to that

effect with Owatonna.[10]  (Def.'s Opp'n Mem. at 3-4; Scott Williams Aff. Ex. D at 52-53;

98-99, Ex P. at 40-44.)  Yet, Web expressly states that it "hired Owatonna to perform the

---

[10] Web did enter into several subcontract agreements with entities that provided construction services at the Itron facility, which appear on the "Subcontractor List."  (Scott Williams Aff. Ex. N.)  Notably, Web identifies itself as the entity responsible for "Concrete" work on the Subcontractor List and there is no reference to Owatonna.  (Id.)

entire Concrete Material section of the Specifications Manual, including testing the

aggregate for the presence of shale." (Josh Williams Suppl. Aff. ¶ 3.) The record,

however, is unclear as to whether Owatonna ever received the Specifications Manual.[11]

In addition, a factual dispute exists as to whether the concrete mix in this case was

merely a standard mix or was custom fabricated to Itron's specifications. Web asserts

that the concrete mix was custom fabricated because Owatonna had to hire a professional

engineering firm to create the formula pursuant to the requirements of the Specifications

Manual. (Pl.'s Mem. at 13.) Notably, Owatonna claims that the concrete mix used for

the Itron project was used on other projects and that there was nothing special about it.

(Scott Williams Ex. P at 92-93, 95-96, 119-21.) Furthermore, Cincinnati's expert

---

[11] Q: Was Owatonna provided the entire specifications manual?
***
 A: **There again, I don't know how they could've put together a bid without it.**
***
Q: Do you know what documentation Owatonna had at the time it submitted its proposal?

A: **No.**

(Scott Williams Aff. Ex D at 98-99.)

Q: Did Owatonna have a copy of the specs manual?

A: **I don't know if Web had sent it over or not until after the fact or if it was ahead of the time or before the bid actually went out or not. I do not know.**

Q: So Owatonna had a copy of the specifications manual?

A: **But, I don't know when we got that.**

Q: You're not aware of when Owatonna received that?

A:  **Right.**

(Id. Ex. P at 41.)

testified that this was a "standard batch mix." (Id. Ex. H at 4.)  This cannot be

reconciled with Web's assertion that the concrete mix was "tailored specifically for the

Itron project, and was further customized according to the unique characteristics of the

concrete after transport." (Pl.'s Reply Mem. at 10; Josh Williams Aff. ¶¶ 7, 8, 10, 11;

Josh Williams Supp. Aff. ¶¶ 2-5.)   Indeed, as noted above, the record is unclear as to

whether Owatonna was aware of the specifications for the concrete mix – in particular

that it contain no shale.  The bottom line is that genuine issues of material fact exist with

respect to this issue such that the Court cannot decide whether Owatonna is a

"subcontractor" as a matter of law.

### B.      Owatonna's Role in Providing On-Site Services for the Itron Project

Web argues that Owatonna provided a number of on-site services for the Itron

project. (Pl.'s Mem. at 14-15.)  In particular, Web asserts that Owatonna was responsible

for depositing the concrete into a pump-truck hopper, operating the pump-truck

equipment, and physically pumping the concrete to its final location pursuant to Section

3.04B of the Specifications Manual. (Id.  ¶¶ 12, 15-18.)  Web also claims that Owatonna

had to continuously mix the concrete in its specialized ready-mix trucks while it was at

the Itron facility to prevent premature curing.   (Josh Williams ¶ 12.)  Furthermore, Web

asserts that Owatonna had to add water or superplasticizer to bring the concrete back to

specification. (Id. ¶ 17.)

In response, Cincinnati asserts that Owatonna's role was limited to driving the

concrete ready-mix to the Itron job site and Owatonna had no other connection to the

Itron project in terms of labor or materials.[12]   (Scott Williams Aff. Ex. P at 96-100, 109,

112.)   Cincinnati also points out that there is no written agreement between Web and

Owatonna for performing on-site services at the Itron facility.   (Def.'s Mem. at 38.)   The

record is further muddied by the fact that Web was not aware that Owatonna had

delegated the fabrication and distribution services to other companies (Huntingdon,

Waseca, and CPI) until after delivery and installation of the concrete began.[13]   (Josh

Williams ¶ 19.)   Thus, genuine issues of material fact exist with respect to Owatonna's

role in providing on-site services for the Itron project.

## CONCLUSION

Neither party has satisfied its burden of demonstrating that no genuine issue of

material fact exists.   Based on the foregoing, and all the files, records, and proceedings

herein, **IT IS ORDERED** that Web's Motion for Summary Judgment (Doc. No. 18) and

Cincinnati's Motion for Summary Judgment (Doc. No. 19) are **DENIED**.

Date:  November 29, 2007

s/ Richard H. Kyle
RICHARD H. KYLE
United States District Judge

---

[12] Indeed, Owatonna considered itself a supplier and not a subcontractor for Web.  (Scott
Williams Aff. Ex. P at 100, 112.)  However, Owatonna acknowledged that it had CPI perform
pumping services for the Itron project.  (Id. at 62.)

[13] Web contends that David Seykora, owner of Owatonna, had an ownership interest in
Huntingdon, Waseca, and CPI, and that each entity was acting as Owatonna's subcontractors for
the Itron project.  (Pl.'s Mem. at 14 n.2.)  However, the record is unclear as to whether Owatonna
owned these companies or whether they were truly separate entities.  (See Scott Williams Aff.
Ex. P at 11, 14, 23-25.)